IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

ANTHONY HOUCHIN,

    Plaintiff,

v.

SHARP DETAILS GA, LLC DBA
PRIME APPEARANCE,

    Defendant.

Civil Action No.    4:25-cv-259

JURY TRIAL DEMANDED

## COMPLAINT FOR DAMAGES

COMES NOW the Plaintiff, Anthony Houchin (hereinafter "Plaintiff" or "Mr. Houchin"), and files this Complaint against the Defendant, Sharp Details GA, LLC dba Prime Appearance (hereinafter "Defendant"), for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and Georgia state tort law, including intentional infliction of emotional distress.

## INTRODUCTION

Anthony Houchin, an openly gay male, was subjected to months of relentless homophobic abuse by his supervisor, Quinton Tate who told Plaintiff that seeing gay men "makes my skin crawl," repeatedly calling him a "queer bitch," "that gay MFer," and "faggot bitch," making vulgar sexual comments about Plaintiff "liking

1

a lot of cucumbers" in reference to anal sex, making gyrating hip movements and sexual gestures when discussing Mr. Houchin, instructing other employees not to help "that queer MF," and intentionally sabotaging Mr. Houchin's work. Despite Mr. Houchin's repeated complaints to management, Defendant took no action and instead terminated Plaintiff on August 28, 2024, under false pretenses minutes after the customer representative approved his work and texted him "I felt you were doing a great job." Approximately one hour after Plaintiff's termination, Tate celebrated by stating "ding dong, the faggot bitch is dead."

## JURISDICTION AND VENUE

1.

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 42 U.S.C. § 2000e-5(f)(3), as Plaintiff brings claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.

2.

This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as such claims are so related to the federal claims that they form part of the same case or controversy.

2

3.

Venue is proper in the United States District Court for the Southern District of Georgia, Savannah Division, pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, including Plaintiff's employment and termination in Savannah, Chatham County, Georgia.

**ADMINISTRATIVE EXHAUSTION**

4.

All conditions precedent to the filing of this lawsuit have been satisfied. Plaintiff timely filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), designated as Charge No. 415-2025-00001, on or about September 27, 2024.

5.

On September 17, 2025, the EEOC issued a Notice of Right to Sue to Plaintiff.

6.

This Complaint is filed within ninety (90) days of Plaintiff's receipt of the Notice of Right to Sue and is therefore timely filed.

## PARTIES

7.

Plaintiff Anthony Houchin is an individual and voluntarily submits to the jurisdiction of this Court.

8.

Defendant Sharp Details GA, LLC d/b/a Prime Appearance is a wholly owned subsidiary of PrimeFlight Aviation Services, Inc., and is a Georgia Limited Liability Company.

9.

At all times relevant hereto, Defendant was an employer engaged in an industry affecting commerce within the meaning of Title VII and employed fifteen (15) or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year. Defendant currently employs approximately forty (40) hourly employees at its Savannah, Georgia location and more than five hundred (500) employees company-wide.

10.

Defendant may be served via its registered agent Cogency Global Inc., located at 900 Old Roswell Lakes Parkway, Suite 310, Roswell, GA 30076.

## FACTUAL ALLEGATIONS

### Employment Background and Promotion

11.

Plaintiff was hired by Defendant on or about August 29, 2023, as an Aircraft Detailer at Defendant's Dulles, Virginia location.

12.

Due to his strong work ethic and exceptional skills, Plaintiff was promoted to Operations Manager within approximately one month of his hire date, on or about September 28, 2023, with an annual salary of $85,000.

13.

During his approximately nine months of employment at the Dulles location, Plaintiff maintained a clean disciplinary record with no corrective actions.

14.

On or about April 2, 2024, Defendant offered Plaintiff a lateral transfer to the position of Operations Manager at its Savannah, Georgia location, effective May 1, 2024.

15.

Plaintiff began working at the Savannah location on or about May 6, 2024, reporting to Quinton Tate, Director of Operations, with responsibilities including managing janitorial staff at Defendant's client Gulfstream Aerospace Corporation.

**Protected Status**

16.

Plaintiff is an openly gay male and was so at all times during his employment with Defendant.

17.

Plaintiff's sexual orientation was known to his superiors, coworkers, and management at all times relevant to this Complaint.

18.

Plaintiff is a member of protected classes under Title VII based on his sex (including sexual orientation).

## Harassment by Quinton Tate and Others

19.

Shortly after his transfer to the Savannah location, Plaintiff became the target of severe and pervasive harassment and discrimination based on his sexual orientation.

20.

On or about May 15, 2024, Director of Operations Quinton Tate commented to Plaintiff regarding a Gulfstream Operations Manager named Justin that Justin was "sweet" and "walks and acts real feminine."

21.

Tate knew Plaintiff was gay when he made this comment.

22.

In or about mid-June 2024, Tate, in the presence of Plaintiff and Senior Operations Manager Daphne Gettler, saw an openly gay Gulfstream employee and stated, "I don't know how they let him work here. It makes my skin crawl to see guys walking around like women."

23.

In or about late June 2024, Shift Lead Max Johnson stated to Plaintiff that his job is "Like taking it up the ass."

24.

In or about early July 2024, Tate had a conversation with Plaintiff in which Plaintiff's male partner and Tate's wife were referenced. Regarding Plaintiff's male partner, Tate said, "I understand it, but I just don't respect it. I don't see how it makes sense. It's not something I'm comfortable with."

25.

Tate's discriminatory animus and harassment toward Plaintiff was witnessed and corroborated by other employees, including former aircraft detailer Machinze Lupa, a member of the LGBTQ+ community.

26.

Ms. Lupa witnessed Tate frequently refer to Plaintiff using derogatory slurs, including calling him a "queer bitch" and stating he dressed "like a queer."

27.

Tate made vulgar sexual comments about Plaintiff, stating that Plaintiff "probably likes a lot of cucumbers" in reference to anal sex.

28.

Tate would regularly say "that gay MFer, I don't like him" and would intentionally leave extra work for Plaintiff to complete, telling other employees not to help "that queer MF."

29.

On one occasion, Tate called Plaintiff an "ass grabber."

30.

Tate made gyrating hip movements and sexual gestures with his hands when talking about Plaintiff and made comments about "tossing a salad."

31.

On at least one occasion, Tate referred to Plaintiff as a "black MFer," combining both racial and sexual orientation-based slurs.

32.

Equipment and supplies would be left in disarray specifically for Plaintiff's shift, while other employees' work areas were not left in such condition, creating additional work for Plaintiff intentionally.

**Complaints to Management (Protected Activity)**

33.

In late May 2024, approximately a week and a half after Tate's first discriminatory comment, Plaintiff reported Tate's harassment to Senior Operations Manager Daphne Gettler.

34.

Gettler responded by saying, "Let me get my feet settled in and figure out what's going on, and I will address this with you at a later time."

35.

Gettler never followed up regarding whether she had addressed Tate's discriminatory and harassing comments, despite Plaintiff specifically asking her whether she had done so.

36.

On or about August 7, 2024, Plaintiff again complained to Gettler that Tate was continuing to make comments to him about his sexual orientation.

37.

Defendant took no action to investigate Plaintiff's complaints, to remedy the hostile work environment, or to discipline Tate for his discriminatory and harassing conduct.

**<u>Pretextual Termination</u>**

38.

On August 27, 2024, Plaintiff and his team were assigned to complete the final cleaning of aircraft number 72141 (also referred to as aircraft 41) prior to its delivery to a customer.

39.

Due to ongoing short-staffing issues, Plaintiff's crew worked from approximately 2:00 PM on August 27, 2024, until approximately 4:00 AM on August 28, 2024—a shift of approximately 14 hours—to complete the job.

40.

On the morning of August 28, 2024, at approximately 2:00 PM, Plaintiff conducted a scheduled mandatory walk-through inspection of the aircraft with Gulfstream Operations Manager Ricky Olmos.

41.

During the walk-through, Olmos expressed satisfaction with the results and signed off on the required delivery documentation, as nothing out of the ordinary was found that could not easily be addressed or prevent the aircraft from being delivered on time.

42.

Minutes after receiving Olmos's sign-off, Plaintiff was called into a meeting with Logan Turner, Senior Director of Operations, and Quinton Tate.

43.

During this meeting on August 28, 2024, Plaintiff was issued both a Final Warning for an issue involving the cleanliness of a shared office/storage room and

a termination notice for "unsatisfactory performance" related to the aircraft that had just been approved for delivery.

44.

The storage room issue that formed the basis for the Final Warning involved a shared office/storage room in Hangar G to which multiple teams had access and which employees on other teams continuously used to store items without regard for organization and cleanliness.

45.

Plaintiff had proactively attempted to address the cleanliness issue by requesting keys to the room to control access on August 13, 2024, and again on August 22, 2024, but Defendant never provided the keys.

46.

On August 23, 2024, Plaintiff's team began cleaning the storage room but had to redirect their efforts to a higher priority task—cleaning a scheduled aircraft—in accordance with Defendant's directive to prioritize customer needs and aircraft delivery.

47.

While Plaintiff's team was working on that aircraft, they received an additional urgent request from Gulfstream to clean a second aircraft because the

buyer would be arriving the next morning, which extended the team's workday to approximately 12 hours and resulted in one crew member walking off the job.

48.

The alleged "unsatisfactory performance" related to aircraft 41 that formed the basis for Plaintiff's termination was contradicted by the contemporaneous sign-off and approval from Gulfstream's representative, Ricky Olmos.

49.

Approximately one hour after Plaintiff's termination, Olmos texted Plaintiff stating: "It was just the normal items we walked today... I felt you were doing a great job and always following up and trying to perfect it as well."

50.

In Plaintiff's entire time working at Gulfstream for Defendant, his team never delivered an aircraft late and was always able to address typical minor concerns that arose during walk-throughs, despite being regularly short-staffed and working shifts that often stretched beyond 10 hours.

51.

Following Plaintiff's termination on August 28, 2024, Tate and Turner were witnessed laughing and celebrating, with Tate stating, "ding dong, the faggot bitch

is dead" and making comments about Plaintiff now having "enough money saved up for cucumbers" in a sexual reference.

52.

Ms. Lupa, who witnessed this conduct, quit her employment with Defendant approximately two weeks after Plaintiff's termination because she could not continue working in such a hostile environment under Tate's supervision.

**Comparative Evidence**

53.

Senior Operations Manager Daphne Gettler, a non-gay female, shared responsibility with Plaintiff for the same tasks that formed the basis for Plaintiff's termination, including the timely delivery and cleanliness of aircraft and the cleanliness of the storage room.

54.

Gettler and Plaintiff both worked on aircraft 41 on August 27 and 28, 2024.

55.

By Gettler's own admission, she received two write-ups at the same time Plaintiff did and had received at least one prior write-up.

56.

Despite sharing responsibility for the same performance issues for which Plaintiff was terminated, Gettler was not terminated but was instead demoted from Senior Operations Manager to Operations Manager, received a pay cut, and was placed on a 90-day probationary period.

57.

The disparate treatment of Plaintiff compared to Gettler demonstrates that Defendant's stated reasons for terminating Plaintiff were pretextual and that Plaintiff's termination was motivated by discrimination based on his sex and sexual orientation and in retaliation for his complaints of discrimination.

**Damages**

58.

As a direct and proximate result of Defendant's unlawful discrimination and retaliation, Plaintiff has suffered and continues to suffer severe emotional distress, mental anguish, humiliation, anxiety, depression, and post-traumatic stress disorder.

59.

Plaintiff has been diagnosed with anxiety and depression as a direct result of Defendant's discriminatory and retaliatory conduct.

60.

Following his termination, Plaintiff experienced suicidal thoughts, lost his home, lost his car, depleted his savings, and lost his health insurance.

61.

Plaintiff's 10-year relationship with his partner ended as a result of the emotional and financial devastation caused by Defendant's conduct.

62.

Plaintiff has been forced to rely on others for basic needs, has faced food insecurity, and has incurred significant debt.

63.

Plaintiff has suffered significant damage to his credit score due to his inability to pay rent and credit cards following his termination.

64.

Plaintiff has incurred and continues to incur medical expenses for treatment of the emotional and psychological injuries caused by Defendant's conduct.

65.

Plaintiff's termination has caused him significant damage to his professional reputation and has made it difficult for him to obtain comparable employment in the aviation industry.

66.

At the time of his termination, Plaintiff was earning $85,000 per year. Following his termination, Plaintiff obtained employment as an Aircraft Detailer at Real Clean Aviation in Tampa Bay, earning $26 per hour for approximately 20 hours per week with no benefits, resulting in substantial lost wages and benefits.

## COUNT I: HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII

67.

Plaintiff incorporates by reference paragraphs 1-66 as if fully set forth herein.

68.

Plaintiff is a member of a protected class based on his sex, including his sexual orientation and his non-conformance with male gender stereotypes.

69.

Defendant subjected Plaintiff to unwelcome harassment, including derogatory comments, slurs, insults, sexual gestures, and intentional sabotage of his work.

70.

The harassment was based on Plaintiff's sex, sexual orientation, and his failure to conform to male stereotypes.

17

71.

The conduct was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment. The harassment included, but was not limited to: Director of Operations Quinton Tate repeatedly making derogatory comments about gay men being "sweet" and "feminine"; stating that gay men make his "skin crawl"; expressing disrespect for Plaintiff's same-sex relationship; calling Plaintiff a "queer bitch" and stating he dressed "like a queer"; making vulgar sexual comments about Plaintiff; telling employees not to help "that queer MF"; making sexual gestures and comments about Plaintiff; and intentionally leaving extra work for Plaintiff's shift.

72.

Defendant knew or should have known about the harassment. Quinton Tate, a manager with authority over Plaintiff, was the primary harasser. Additionally, Plaintiff directly complained to Senior Operations Manager Daphne Gettler in late May 2024 and again on or about August 7, 2024 about Tate's discriminatory and harassing conduct.

73.

Despite Plaintiff's complaints, Defendant failed to take prompt and effective remedial action. Gettler promised to address the harassment but never followed up.

18

Defendant took no action to investigate Plaintiff's complaints, remedy the hostile work environment, or discipline Tate for his conduct.

74.

As a direct and proximate result of Defendant's violation of Title VII, Plaintiff has suffered damages including lost wages, lost employment benefits, severe emotional distress, mental anguish, anxiety, depression, humiliation, and other compensatory damages.

## COUNT II - RETALIATION IN VIOLATION OF TITLE VII

75.

Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

76.

Plaintiff engaged in protected activity under Title VII when he complained to Senior Operations Manager Daphne Gettler in late May 2024 about the discriminatory and harassing comments made by Director of Operations Quinton Tate regarding Plaintiff's sex and sexual orientation.

19

77.

Plaintiff again engaged in protected activity under Title VII when he complained to Gettler on or about August 7, 2024, about Tate's continued discriminatory comments regarding Plaintiff's sexual orientation.

78.

Defendant subjected Plaintiff to a materially adverse employment action by terminating his employment on August 28, 2024.

79.

A causal connection exists between Plaintiff's protected activity and his termination. The temporal proximity between Plaintiff's final complaint on or about August 7, 2024, and his termination on August 28, 2024—less than three weeks later—establishes a causal link.

80.

The pretextual nature of Defendant's stated reasons for termination further demonstrates the causal connection. Plaintiff received approval from the customer representative for the aircraft's condition just minutes before being terminated, and Plaintiff had been prevented from completing the office cleaning due to higher-priority customer demands in accordance with company directives.

81.

As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered damages including lost wages, lost employment benefits, severe emotional distress, mental anguish, anxiety, depression, humiliation, and other compensatory damages.

## COUNT III - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED)

82.

Plaintiff incorporates by reference paragraphs 1-66 as if fully set forth herein.

83.

Defendant, through its agents and managers, including Quinton Tate and Logan Turner, acted intentionally or with reckless disregard for the likelihood of causing emotional distress to Plaintiff.

84.

The conduct by Defendant's agents and managers was extreme and outrageous, going beyond all possible bounds of decency, and was atrocious and utterly intolerable in a civilized community.

21

85.

The extreme and outrageous conduct included, but was not limited to: a pattern of vile, homophobic, and racist slurs directed at Plaintiff; public humiliation through derogatory comments about Plaintiff's sexual orientation and mannerisms; frequent use of terms such as "queer bitch," "gay MFer," and "faggot bitch"; vulgar sexual comments and gestures about Plaintiff; intentional sabotage of Plaintiff's work; retaliatory discharge designed to cause maximum harm; and a celebratory, hateful comment made by Tate immediately after the termination, stating "ding dong, the faggot bitch is dead."

86.

There is a direct causal connection between Defendant's extreme and outrageous conduct and Plaintiff's severe emotional distress.

87.

As a direct and proximate result of Defendant's extreme and outrageous conduct, Plaintiff has suffered and continues to suffer severe emotional distress, including diagnosed anxiety and depression, suicidal thoughts, the destruction of his long-term relationship, loss of his home and car, significant financial devastation, humiliation, loss of self-esteem, insomnia, and other physical and emotional manifestations of severe distress.

88.

Defendant's conduct entitles Plaintiff to compensatory and punitive damages under Georgia law.

**COUNT IV: CLAIMS FOR
ATTORNEYS' FEES UNDER O.C.G.A § 13-6-11 AND ATTORNEY'S FEES
AND EXPENSES OF LITIGATION UNDER 42 U.S.C. § 2000e-5(k).,
PUNITIVE DAMAGES UNDER O.C.G.A. § 15-12-5.1 AND 42 USC §1981a,
AND ATTORNEY'S FEES**

89.

Plaintiff incorporates by reference all paragraphs 1-66 as if fully set forth herein.

90.

Defendant has refused Plaintiff's efforts to resolve this matter prior to filing suit and has acted in bad faith, been stubbornly litigious, and caused Plaintiff unnecessary trouble and expense.

91.

Defendant's discriminatory and retaliatory actions were undertaken with malice or with reckless indifference to Plaintiff's federally protected rights under Title VII and Georgia law.

23

92.

Defendant's managers, including Quinton Tate and Logan Turner, were aware of Defendant's policies prohibiting discrimination and harassment, including its Equal Employment Opportunity policies.

93.

Despite this knowledge, Defendant's managers deliberately disregarded those policies and Plaintiff's federally protected rights by engaging in severe and pervasive harassment, failing to take any remedial action after receiving complaints, and retaliating against Plaintiff for engaging in protected activity.

94.

Plaintiff is entitled to punitive damages for the state law claim of intentional infliction of emotional distress pursuant to O.C.G.A. § 51-12-5.1 and for violations of Title VII of the Civil Rights Act of 1964 (as amended) 41 U.S.C. §1981a.

95.

Defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

24

96.

Such conduct includes the use of vile homophobic and racist slurs, vulgar sexual comments and gestures, public humiliation, intentional sabotage of Plaintiff's work, retaliatory discharge, and celebration of Plaintiff's termination with homophobic slurs.

97.

Plaintiff is further entitled to recover reasonable attorneys' fees and costs as the prevailing party under Title VII, 42 U.S.C. § 2000e-5(k).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

(a) An award of back pay, lost benefits, and other economic losses from the date of his unlawful termination to the date of judgment, together with pre-judgment interest thereon;

(b) An award of front pay in lieu of reinstatement;

(c) Compensatory damages for past and future emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life, in an amount to be determined at trial;

(d) Punitive damages for Defendant's malicious and reckless conduct, pursuant to 42 U.S.C. § 1981a and O.C.G.A. § 51-12-5.1;

25

(e) Reasonable attorneys' fees and the full expenses of litigation, pursuant to

42 U.S.C. § 2000e-5(k) and O.C.G.A. § 13-6-11;

(f) Injunctive relief prohibiting the Defendant from continuing its unlawful

employment practices;

(g) Declaratory relief to the effect that Defendant has violated Plaintiff's

rights under Title VII of the Civil Rights Act of 1964 and the laws of the

State of Georgia; and

(h) Any other and further relief the Court deems just and proper.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 31st day of October, 2025.

**BARRETT & FARAHANY**

*s/ Constance Cooper*

Constance Cooper
Georgia Bar No. 469041
*Counsel for Plaintiff*

2921 Piedmont Rd NE
Atlanta, Georgia 30305
(404) 214-0120
constance@justiceatwork.com

26